# Exhibit 1

```
              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF IDAHO


JOSHUA KELLY, JOSE PINA, ANDREW  )
IBARRA, RAY BARRIOS, RANDY       )
ENZMINGER, MICHAEL MIERS,        )
PRISONER A, and PRISONER F,      )
individually and on behalf of    )
a class of all other persons     )
similarly situated,              )   Case No.
                                 )   1:11-cv-00185-EJL
         Plaintiffs,             )
                                 )
vs.                              )
                                 )
TIMOTHY WENGLER and CORRECTIONS  )
CORPORATION OF AMERICA, INC.,    )
                                 )
         Defendants.             )
_____)
```

DEPOSITION OF TIMOTHY HIGGINS

Boise, Idaho

July 26, 2013

```
 1                DEPOSITION OF TIMOTHY HIGGINS,
 2   taken at the instance of the Plaintiffs at the offices of
 3   Naylor & Hales, 950 West Bannock Street, Suite 610, in the City
 4   of Boise, State of Idaho, commencing at 9:02 a.m. on Friday,
 5   July 26, 2013, before WENDY J. MURRAY, CSR, a Notary Public in
 6   and for the State of Idaho, pursuant to Notice and in
 7   accordance with the Idaho Rules of Civil Procedure.
 8
 9
10                      A P P E A R A N C E S
11
12   For the Plaintiffs:          RICHARD ALAN EPPINK, Esq.
                                  AMERICAN CIVIL LIBERTIES UNION
13                                   of IDAHO FOUNDATION
                                  Post Office Box 1897
14                                Boise, Idaho   83701
                                      -and-
15                                STEPHEN L. PEVAR, Esq.
                                  AMERICAN CIVIL LIBERTIES UNION
16                                   FOUNDATION
                                  330 Main Street, First Floor
17                                Hartford, Connecticut   06106
18   For the Defendants:          NAYLOR & HALES, P.C.
19                                by KIRTLAN G. NAYLOR, Esq.
                                  950 West Bannock Street,
20                                   Suite 610
                                  Boise, Idaho   83702
21
     For the Witness:             WILLIAM M. LOOMIS, Esq.
22                                DEPUTY ATTORNEY GENERAL
                                  CRIMINAL LAW DIVISION
23                                DEPARTMENT OF CORRECTION
                                  1299 North Orchard, Suite 110
24                                Boise, Idaho   83706
25
```

1  investigation process and such.

2      Q.   And that was in about 2008. Is that right?

3      A.   I believe that's correct.

4      Q.   Any other extensive evaluations that you've done

5  or analyses or reports that you've done on ICC?

6      A.   Following that, we had the beating of Hanni

7  Elabed, an offender at the -- in the PIE building at the Idaho

8  Correctional Center. I was assigned to be the chairman or

9  board for the serious incident review board that was compiled

10 on that. So we did an extensive study of the incident that

11 took place.

12     Q.   Any others?

13     A.   Those are all that come to mind.

14     Q.   I gather then that you're pretty intimately

15 familiar with ICC, both the physical facility and the

16 management and the operations of that prison?

17     A.   I am.

18     Q.   Now, a lot of what I want to ask you about today

19 has to do with staffing at ICC. And if I understand

20 correctly -- and most of the information that I have at this

21 point is honestly from the documents that were produced to us

22 yesterday.

23          But if I understand correctly, at some point

24 around December of 2012, your unit, your contract -- I can't

25 remember what you called it -- the CPOU -- began a more

1  intensive oversight of, or at least monitoring of, staffing at
2  ICC.  Is that -- is that correct?
3       A.   No.
4       Q.   Okay.
5       A.   In October of that same year we were in the
6  process of developing a contract prison oversight manual, and
7  in the early phases of that we took a look at what was going on
8  or how that was monitored in other facilities, including how
9  the Colorado Department of Correction monitored staffing at the
10 Burlington facility, at the Kit Carson Correctional Center.
11 And from that, we found that they had a much more comprehensive
12 method in place than what we had.
13          Part of that included they had a list of all
14 mandatory posts according to the contract.  The facility on a
15 daily basis was required to give a list of the person who was
16 in that post, the number of hours that they pulled in that
17 post, and if they -- including an entry control document and
18 other source documents to show that was accurate, okay.
19          So our discussion at that point with my
20 supervisor was we took a look at what we were currently being
21 provided, which was simply the staff rosters for security,
22 okay, and overtime reports showing the number of hours the
23 employees worked overtime, because we had a limitation of 32
24 hours during a two-week period as a limit.  That's all the
25 documentation we were given.

1  Discussion with our leadership in our department
2  was that was not sufficient. That did not include the
3  program-related posts, the teachers, the counselors, the --
4  everybody else in that facility besides the security people.
5  And so as such at that point, we began developing plans to
6  start expanding out our requirements on reporting to include
7  all mandatory posts that were required in accordance with our
8  contract. That was our first step at looking into that.
9  Coupled with that, about the same time frame --
10 matter of fact, just before that -- we started hearing reports
11 that came from the offenders through the ACLU -- so I guess
12 this would be hearsay -- but we were provided information from
13 the ACLU through James Huegli, the contract monitor, compliance
14 monitor for the Kelly settlement agreement, that there was
15 insufficient staffing that were inside of that; that there were
16 some allegations floated out from the inmate about, well, when
17 our monitors weren't there, the staff left the unit; that the
18 only time it appeared there was a full staff there was when we
19 were there, okay. So that started our discussion as well or
20 was included in our discussion in October on the need to
21 provide more thorough analysis of that.
22       Q.    Okay, right, and I did see that. And then at
23 some point, I believe it was in December --
24             MR. NAYLOR: What year are we talking about?
25             MR. EPPINK: 2012.

1   Q.   BY MR. EPPINK:  In December of 2012, there was
2   what I believe was a short action plan that I think that you
3   wrote that were instructions to contract monitors to do a
4   little bit more probing into the staffing issues than perhaps
5   they had been doing before.  I didn't bring it with me.  But do
6   you -- do you know what I'm talking about?
7   A.   I do.
8   Q.   Okay.
9   A.   That was specifically --
10          MR. LOOMIS:  Go off the record for just a minute.
11                    (Recess.)
12   Q.   BY MR. EPPINK:  I don't recall exactly what the
13   question was, Tim, but basically I was asking about the action
14   plan that I believe you created in December of 2012.  It was
15   appended to the anonymous tip that had been forwarded from
16   Jim Huegli.  And that action plan, did that begin in December
17   of 2012, or was it something that was implemented later or some
18   point earlier?
19   A.   In the action plan, it also identifies that we
20   had already had in place some more significant monitoring that
21   I was having the staff do.  Paying closer attention to the
22   staffing that were in the unit, that was from some of the other
23   information that we had had.
24          The action plan itself was based off of an e-mail
25   that I received from James Huegli that he had received from an

Case 1:11-cv-00185-EJL   Document 66-1   Filed 08/14/13   Page 8 of 9

29

1  anonymous source that was obviously, based off the content,
2  appeared to be a staff member working at the facility that
3  identified the term "ghost posts," that there was posts that
4  were being reported that were -- to us as being filled that
5  were not. And so with it, I put a -- required my monitors to
6  take some additional steps at that point to try and identify
7  was there any validity to that.
8      Q.   Now, was the -- if I understand you about what
9  the changes that began in October of 2012, those came from
10 looking at the Kit Carson facility and looking at what was
11 being done there to monitor staffing before the December 2012
12 e-mail that was forwarded from Jim Huegli. Was there something
13 before that had prompted to look at Kit Carson in October to
14 look at possible changes in how you monitor staffing?
15     A.   No.
16     Q.   Okay. So in other words, it seemed, to me, after
17 I looked at the documents and the December action plan, that
18 essentially as soon as you got some wind that there may be
19 staffing problems at ICC, that you pretty much immediately
20 began implementing efforts to try to determine the extent of --
21 or, whether there were problems and the extent of what they
22 were?
23     A.   Yes.
24     Q.   Now, there's some basics that I want to kind of
25 make sure that I understand, and I have -- I've been working on

HEDRICK COURT REPORTING
P. O. BOX 578, BOISE, ID  83701

## Security Staffing Review Chronology

| Date | Document | Subject |
|---|---|---|
| 8/7/2012 | Interview between ICC staff member and James Huegli, Attorney | DEF housing units are constantly understaffed, consequently officers are forced to work overtime or are pulled from other posts in the facility to work that unit. |
| 12/13/12 | Email from James Huegli, Attorney forwarded a letter written by an anonymous ICC staff member | "Ghost workers" are referred to as being CCA employees who are reported as working a post on the ICC shift roster, but were never present at the facility during those shifts. ICC employees were threatened with disciplinary action if they documented in the log book the number of staff physically present in a housing unit. |
| 12/22/12 | Email from James Huegli, Attorney | Huegli requested IDOC produce documents on staffing studies done at ICC due to suspicions that ICC is not complying with staffing requirements, using "ghost people", and "making up" the data reported. |
| 1/8/2013 | Email from Steven Pevar, ACLU | Pevar asked the IDOC Director to assign staff to evaluate ICC staffing reports to determine if staffing records are "padded", non-security staffs are assigned to security posts, unsupervised trainees are assigned to security posts, and staffing reports are fabricated or falsely reported. |
| 1/10/13 | Response from Tim Higgins to Mark Kubinski regarding 1/8 email from Pevar | IDOC CPOU is putting into place a more extensive daily reporting process. CPOU began an audit on 1/3/12 of ICC staffing reports for 2012. |
| 1/18/13 | Email from Rebecca Boone, Associated Press reporter | A public records request was submitted for ICC shift logs, staff logs, and payroll records for 2012. It appears as though she suspects a discrepancy exists between what ICC staffing documents show and the actual number of CO's on duty. |
| 1/22/13 | Letter from Tim Higgins to ICC Warden Wengler | IDOC will be conducting a staffing audit at ICC for 2012. The Warden was asked to provide the IDOC with the "Entry Control Accountability Report" for every day in April, June, August, and October of 2012. |
| 1/24/13 | Internal IDOC email from Tim Higgins | Kirt Naylor, CCA Attorney, brought up "ghost staffing" issue during a phone call between Naylor and Higgins. He asked Tim to be available for a conference call with Naylor and Kevin Myers within a day or two. |
| 1/25/13 | Internal IDOC email from Tim Higgins | The email describes a telephone call Tim Higgins received from Kevin Myers during the evening on 1/24/13 during which Myers admitted that several months ago an investigator with CCA corporate office was approached by ICC staff about ICC Administrators |

Natalie Wolfe, Contract Services Bureau                    May 7, 2013