STEPHEN L. PEVAR
American Civil Liberties Union Foundation
330 Main Street, First Floor
Hartford, Connecticut 06106
(860) 570-9830

RITCHIE EPPINK ISB #7503
American Civil Liberties Union of Idaho Foundation
P.O. Box 1897
Boise, Idaho 83701
(208) 344-9750 ext. 206

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
for the
DISTRICT COURT OF IDAHO

JOSHUA KELLY, et al, Plaintiffs,

v.

TIMOTHY WENGLER, et al, Defendants.

Case No. 1:11-cv-00185-EJL

**AFFIDAVIT OF
SUSAN FRY**

I, Susan Fry, after being duly sworn on oath, hereby depose and state as follows:

1. I am 50 years old, and I reside in Canyon County, Idaho.

2. I began my career in corrections in 1986 working for the Sheriff's Department in Yolo County, California, where I worked for over eight years as a Deputy Sheriff. I moved to Idaho in 1992 and worked for the Canyon County Sheriff's Department until 1994 as a Deputy Sheriff. From 1994 to 2002, I was a security police specialist in the Air National Guard.

AFFIDAVIT OF SUSAN FRY - 1

3. In November 2002, I was hired as a full-time Correctional Officer (CO) at the Idaho Correctional Center (ICC) in Kuna, Idaho. In 2009, I was promoted to Correctional Counselor, which is comparable to the rank of sergeant. I am still employed at ICC but I am on medical leave. As a Correctional Counselor, my job responsibilities include enforcement of policies and assisting in the management of a housing unit, which currently is unit GHI. GHI is a housing unit that is comprised of three smaller units (G, H, and I), that contains 256 beds in each of those three units.

4. I work the day shift and report to Unit Manager Johnson. I occasionally substitute for Unit Manager Johnson when he is unavailable. Prior to working in GHI, I was assigned to the PIE Building, a dormitory-style housing unit.

**CHRONIC UNDERSTAFFING AT ICC**

5. ICC is chronically and severely understaffed.

6. My immediate supervisor, Lt. Danforth, recently admitted to me that "every day" which ever Captain, Lieutenant, or Chief, that is assigned to the building schedule, adds names to the staff roster (also known as the "building schedule") to make it look like ICC is fully staff when, in fact, that isn't true.

7. As best as I can recall, every day for at least the past three years when I've been on duty at ICC, the prison has had fewer correctional officers than are listed on the roster.

8. Based on my observations, vacancies of COs average between 2 and 5 but are often as high as 10 or more on the day shift (which should have approximately ▇ officers). The night shift often has more vacancies then the day shift. ICC works two 12-hour shifts each day.

9. Based on my observations, this inadequate staffing is dangerous and places all prisoners and staff at risk of assault. There is a direct correlation at ICC between the number of staff who

AFFIDAVIT OF SUSAN FRY - 2

are present and the number of fights—and the severity of fights—that occur. Prisoners, especially gangs, sometimes plan their assaults to take place when ICC is inadequately staffed.

10. As a result of understaffing, every day there are supervisors who are instructed to work lower level posts, leaving their supervisory tasks unperformed.

11. I have been pulled from my supervisor's post many times to work as a "floor" CO. My supervisor's post was not covered on most of those occasions. On GHI, for instance, there is supposed to be ▮▮▮▮▮ with ▮▮▮▮▮ or ▮▮▮ for ▮▮▮ Many times I have had to work as a floor officer and no one replaced me as a Correctional Counselor. Sometimes, we're even missing two COs for GHI.

12. GHI is fully staffed only one or two days a month.

13. I used to complain to my supervisory captain and lieutenant about being inadequately staffed at GHI, but was always told to get by with what I had. I eventually stopped complaining because I knew it was useless.

14. At least three times a week due to inadequate staffing, I contacted a supervisor to see if G-H-I could be assigned another floor officer to replace one that's missing. Rarely do I receive one.

15. Recreation is often cancelled due to lack of staff. This presents management problems because prisoners are not given an opportunity to let off steam, and being denied recreation often causes resentment.

16. Due to 12-hour shifts and frequent use of overtime, many officers are exhausted. As a result, many officers make mistakes, are careless, and are inattentive. For instance, officers who work in ▮▮▮ (which ▮▮▮▮▮) often open the wrong doors. This is very dangerous.

AFFIDAVIT OF SUSAN FRY - 3

## FALSIFICATION OF DOCUMENTS BY ICC

17. ICC uses a number of methods to conceal understaffing by falsifying their daily staff logs. One method is to assign supervisors to work as "floor" COs and to then "double-bill" them by showing that both the CO and supervisory positions were filled. To my knowledge, on all the many days that I was taken off my post as Correctional Counselor and assigned as a floor officer, ICC listed me as working both posts.

18. ICC even assigns Case Managers to serve as a floor CO, some of whom have no security training. I have seen this happen many times. This is dangerous; it places them and everyone else at risk. I have often seen Case Managers who have been assigned to a CO post spend the entire shift in their office doing their Case Manager duties, leaving the CO post vacant. One particular Case Manager does this routine between one and three shifts per week. To my knowledge, on all the many days that Case Managers are assigned to security posts, ICC lists them on the staff roster as working both posts. I have even seen the assistant chief of security listed as a floor officer.

19. Another method used by ICC to conceal understaffing is to hold a CO for an extra four hours beyond his/her 12-hour shift, so that the CO works 16 hours, the maximum allowed. The CO will then leave the post 4 hours into the next 12-hour shift. ICC will not assign anyone to work the remaining 8 hours of that shift, but ICC will still list that post as having been covered the entire 12 hours. I have seen this happen many times.

20. A third method used by ICC to conceal understaffing is by assigning "ghost" workers to a post. By this I mean that ICC will falsely state that someone has worked a post when administrators know it isn't true. My name has been listed as working a post on days when I was not even in the building.

AFFIDAVIT OF SUSAN FRY - 4

21. It has been the practice for years now for administrators at ICC to deliberately falsify logs to make it appear that ICC is fully staffed. To my knowledge, virtually everyone who works here, including all administrators, are aware of this deception. Staff rosters at the beginning of each shift are always written lightly in pencil and are constantly being changed. At the end of the day, they are typed up by a supervisor, who makes sure that they show (falsely) that all posts had been covered. In my opinion, this final roster contains false information every day, written by someone who knew it was false.

22. Not long ago I told one of my supervisors, Lt. Danforth, that I was uncomfortable with ICC's falsified records. He confirmed that the building schedule is doctored every day to make it look good for the state.

23. I have complained about staff shortages to an IDOC Compliance Monitor. He said he would look into it. I never received a response, and nothing improved. I know that other officers have notified Compliance Monitors about staff inadequacies, and I know that prisoners frequently point out instances of inadequate staffing to Compliance Monitors.

24. It appears to me that the IDOC Compliance Monitors either are deliberately ignoring daily violations of staffing requirements, or their supervisors at IDOC are, because ICC violates staffing requirements daily that have to be apparent to the Monitors.

25. For instance, the Monitors have to know that ICC is falsifying its staffing logs. First, it would be impossible for them not to notice all the missing staff and yet, at the end of the day, see that ICC has reported 100% staffing on the staff roster. Second, the Monitors would see on a daily basis the supervisors and Case Managers who have been assigned as a floor officer with no one replacing them in their own posts.

AFFIDAVIT OF SUSAN FRY - 5

26. Falsifying documents at ICC is common. In addition to falsifying staff rosters virtually every day, ICC also falsifies the logs that show when prisoners were given pat-down searches. On many occasions, I was told to sign a document acknowledging a pat-down search that I supposedly witnessed that I hadn't witnessed. I verbally complained about this practice to my Unit Manager but nothing was done about it.

## EXCESSIVE VIOLENCE AND OTHER DEFICIENCIES AT ICC

27. The level of violence at ICC has increased during the time I have worked there, and so has the frequency of staff shortages. I believe there is a correlation between the two. Years ago, prisoner assaults were infrequent, but now they happen on nearly an every day basis. I do not feel safe working at ICC, and other staff have told me that they are afraid, too.

28. Due to staff shortages, many assaults at ICC aren't observed and reported. Thus, the level of violence at ICC is higher than what ICC is reporting. At least once or twice a month, for instance, I have found prisoners with injuries that were received in an assault days earlier where those assaults and injuries were not reported. Yet officers are supposed to conduct a close visual inspection during "count" and should have seen those injuries and reported them.

29. It is my belief that one reason why many assaults aren't being reported by staff is because they don't want to do the extra paperwork.

30. I haven't complained in writing about working conditions very often because I am afraid that I will be fired if I do. On the few occasions that I did complain in writing, I didn't receive a response. My reports would simply disappear.

31. I have witnessed prisoner grievance forms being ignored and even discarded by staff. Officers often disregard grievances and won't answer them.

32. There are so few staff on duty that officers are often slow to break up a fight because they don't want to get involved until sufficient backup has arrived. Waiting for backup allows time for other prisoners to get involved in the assault and increases the likelihood of serious injuries.

33. Due to inadequate staffing and poor scheduling, prisoner movements often overlap when they shouldn't, resulting in the mixing prisoners who are supposed to be kept apart. This occurs both in the dining hall and recreation. Fights that easily could be prevented will occur as a result of this mixing.

EXECUTED this 3RD day of May, 2013.

_____
Susan Fry

SUBSCRIBED AND SWORN BEFORE ME this 3RD day of May, 2013

_____
Notary Public for the State of Idaho
Residing at: Meridian, Idaho
Commission Expires: April 27, 2019

AFFIDAVIT OF SUSAN FRY - 7

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on the 11th day of June, 2013, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Kirtlan Naylor | kirt@naylorhales.com |
| James Huegli | jameshuegli@yahoo.com |
| Daniel Struck | dstruck@swlfirm.com |
| Tara Zoellner | tzoellner@swlfirm.com |

                                                       By:  Richard Alan Eppink