Kirtlan G. Naylor        ISB 3569
James R. Stoll           ISB 7182
NAYLOR & HALES, P.C.
950 W. Bannock Street, Suite 610
Boise, Idaho 83702
Telephone: (208) 383-9511
Fax: (208) 383-9516
kirt@naylorhales.com
jrs@naylorhales.com

Daniel P. Struck         AZB 012377
*(Admitted Pro Hac Vice)*
Timothy J. Bojanowski    AZB 022126
*(Admitted Pro Hac Vice)*
Tara B. Zoellner         AZB 027364
*(Admitted Pro Hac Vice)*
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@swlfirm.com,
tbojanowski@swlfirm.com
tzoellner@swlfirm.com

Attorneys for Defendants Timothy Wengler and
Corrections Corporation of America, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA KELLY, JOSE PIÑA, ANDREW IBARRA, RAY BARRIOS, RANDY ENZMINGER, MICHAEL MIERA, PRISONER A, and PRISONER F, individually and on behalf of a class of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TIMOTHY WENGLER, and CORRECTIONS CORPORATION OF AMERICA, INC.<br><br>Defendants. | Case No. 1:11-cv-00185-EJL<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY**<br><br>**(DKT NOS. 39, 40)**<br><br>**[FILED UNDER SEAL]** |

Defendants' Corrections Corporation of America, Inc. ("CCA") and Timothy

Wengler respond to Plaintiffs' Motion For An Order To Show Cause Why The Defendants

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)** - **1**

Should Not Be Held In Contempt Of Court ("Contempt Motion") and Plaintiffs' Motion For A Contempt-Phase Discovery Plan ("Discovery Motion"). Both Motions should be denied.

## I. DEFENDANTS CANNOT BE HELD IN CIVIL CONTEMPT

Plaintiffs' Contempt Motion begins with a flawed assumption: "The Settlement Agreement is an order of this Court." (Motion at 4.) It then builds on that faulty assumption by asserting that "federal courts may enforce their orders through the power of civil contempt" pursuant to Rule 70 of the Federal Rules of Civil Procedure, and unilaterally dubs this a "civil contempt proceeding." Before the Court can address the underlying allegations in Plaintiffs' Motions, the scope of this dispute must be put back in its proper context.

First, the Settlement Agreement is <u>not</u> an "order" of this Court. It is a private agreement negotiated by the parties. (Dkt. # 25, Ex. A.) All of the cases Plaintiffs cite involve the enforcement of consent decrees. The Settlement Agreement is not a consent decree, and as this Court is intimately aware, having been present at the three-day settlement negotiations, Defendants rejected every suggestion to enter into a consent decree. That was perhaps the biggest sticking point in the negotiations. Defendants would only agree to a private settlement that did not require judicial approval. They bargained for a settlement agreement, and that is what the parties entered into. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992) ("A consent decree … is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.").

Second, Rule 70 can only be invoked if there has been a violation of a "judgment." *See Westlake N. Prop. Owners Ass'n v. City of Thousand Oaks*, 915 F.2d 1301, 1304 (9th Cir. 1990) ("According to its plain language, this rule applies only to parties who have failed to perform specific acts pursuant to a judgment."). Again, here, there was *no* judgment entered. There was an order granting the parties' stipulation to dismiss the case with prejudice. (Dkt. # 26.) Rule 70 does not apply.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)**
- 2

Plaintiffs' Contempt Motion is really an allegation that a term of the Settlement Agreement has been breached. Fortunately, the process and remedies for breach allegations are set forth in the Settlement Agreement itself. Paragraph 15 of the Settlement Agreement provides: "In the event of non-compliance with the terms of the Agreement," and, if after attempting to resolve the dispute themselves and with the assistance of the ADR Coordinator the dispute remains unresolved, the parties "shall submit the dispute to the Honorable David O. Carter, who shall have authority to enforce the terms of this agreement in his capacity as a Federal District Court Judge." (Dkt. # 25, Ex. A, ¶ 15.) Despite Plaintiffs' improper filing of their Motions on the district court's docket, Judge Lodge properly forwarded them for this Court's review. This is not a civil contempt proceeding, and Defendants cannot be held in contempt of court. It is a dispute that can only be resolved through the dictates of Paragraph 15. Therefore, an "order to show cause" is not appropriate.

## II. CORRECTIVE ACTION IS ALREADY IN PLACE TO PREVENT FUTURE BREACHES OF THE SETTLEMENT AGREEMENT

Paragraph 4 of the Settlement Agreement requires CCA to "comply with the staffing pattern pursuant to CCA's contract with the Idaho Department of Corrections." Plaintiffs allege that CCA intentionally understaffed security posts at ICC and "submitted falsified staffing records" to cover it up, all in an effort to increase profits. This is an outrageous and false claim. After receiving an employee tip that there were discrepancies in ICC shift rosters, CCA notified IDOC and State officials, conducted a 3-month internal investigation (more than 600 hours), disclosed the results of that investigation to IDOC and State officials, and took immediate corrective action. Plaintiffs' Contempt Motion stretches the truth and is yet another attempt to tarnish CCA's reputation.

In November 2012, CCA was in the process of investigating unrelated workplace claims. (Exhibit. 1, ¶ 3.) CCA hired an independent investigator, Patti Ball, to lead that investigation. (Id.) During the course of her investigation, a witness reported potential discrepancies in ICC shift rosters. (Id.) In mid-December 2012, Ball reported the allegation to

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)** - **3**

Scott Craddock, CCA's Ethics Officer and Assistant General Counsel. (Id.) Craddock's office is independent of operations management, and is responsible for investigating significant misconduct allegations and compliance issues. (Id., ¶ 2.) Craddock asked Ball to separately investigate the staffing allegation in order to determine whether it was credible. (Id., ¶ 4.) Ball investigated the claim through January 2013. (Id.)

On January 23, 2013, Ball reported her preliminary findings to Craddock. (Id., ¶ 5.) Based on Ball's preliminary findings, CCA determined that the allegation was credible and that a more thorough investigation was warranted. (Id.) On January 25, 2013, CCA reported the allegations and its belief that the allegations were credible, based on Ball's findings, to IDOC and the Idaho Attorney General's Office, and further informed that an investigation was still in progress. (Exhibit 2, ¶ 4.) IDOC agreed to allow CCA to continue its investigation, and at the same time conducted their own investigation. (Id.) CCA also informed Warden Wengler about the staffing allegations on or about January 25. (Exhibit 3, ¶ 7.) According to Warden Wengler, that was the first time he became aware that the shift rosters may have been compromised. (Id.) On January 28, 2013, two ranking ICC officers – Assistant Chief of Security Daniel Melody and Chief of Security Shane Jepsen – were placed on administrative leave. (Exhibit 2, ¶ 5.) This was based on Ball's preliminary determination that Melody and Jepsen were aware of and/or involved in the conduct resulting in the shift roster discrepancies, which posed a risk to the investigation.[1] (Exhibit 1, ¶ 6.)

On or about February 5, 2013, Gary Shockley and Dewitt Fortenberry of the law firm Baker Donelson, were retained by Craddock on behalf of CCA to take over the staffing investigation.[2] (Exhibit 1, ¶ 8.) They conducted additional interviews and reviewed relevant

---

[1] Ball found no evidence that either Melody or Jepsen informed their superiors, including Warden Wengler, about the roster falsification, or that Melody and Jepsen were ordered by their superiors, Warden Wengler, or CCA headquarters to falsify staffing documents. (Exhibit 1, ¶ 7.)

[2] As noted, Ball was originally retained to investigate unrelated workplace claims. Ball had planned personal and professional commitments that precluded her from committing to the time needed to conduct an investigation of the scope desired by CCA. (Exhibit 1, ¶ 8.) Shockley and Fortenberry met with Ball to be briefed on her findings before they started their investigation. (Id.)

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)** - **4**

ICC records. (Id., ¶ 9.) Their records review focused on staffing during the night shift between April 1, 2012 and October 31, 2012.³ (Id.) The consensus of witnesses had identified that time frame and shift as having the greatest staffing pressure and potential for undocumented hours. (Id.) By mid-March 2013, Shockley and Fortenberry were able to confirm that the night shift rosters had been completed in a way that indicated full staffing even when there were not enough staff in the institution to fully cover all mandatory posts for the full night shift. (Id., ¶ 10.) For example, a staff member working the day shift would work overtime and either begin the shift four hours early or stay four hours late, for a total of 16 hours, which was the maximum number of hours that an employee could work in one day. (Id.) The staff member's name would be included on the night shift's roster even though he or she only worked 4 hours of that shift ███████████████████████████████████████ (Id.)

Shockley and Fortenberry provided investigation status and progress reports to CCA at key points during their investigation, with a full report of findings to date on or about April 4, 2013. (Exhibit 1, ¶ 11.) CCA also kept IDOC abreast of the investigation progress throughout this time. (Exhibit 2, ¶ 7.) On or about March 21, 2013, CCA determined that it had enough corroborated information to begin corrective action, and CCA's Vice President of Facility Operations, Steven Conry, and the Managing Director of Operations (ICC), Kevin Myers, implemented a plan to take immediate corrective action. (Exhibit 2, ¶ 6; Exhibit 3, ¶ 8.) Any mandatory posts were to be fully staffed immediately; if a post could not be fully staffed, the number of hours that the post was vacant needed to be reported and documented, and an explanation of the steps taken to fully staff it needed to be given; and captains and lieutenants were to be advised of these directives, ordered to follow them, and shown how to properly fill out the night shift rosters. (Id.) Shift rosters were reviewed daily and any errors were reported and corrected; and a comprehensive, random audit was conducted once a week to ensure

---

³ There are primarily two shifts at ICC: a day shift – 5:30 a.m. to 5:30 p.m. – and a night shift – 5:30 p.m. to 5:30 a.m. (Exhibit 3, ¶ 3.)

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)** - **5**

compliance. (Id.) Myers discussed the plan and results with Warden Wengler on a weekly or bi-weekly basis, and with IDOC at least once a month. (Id.)

As noted, on or about April 4, 2013, Shockley reported his investigation findings to CCA. (Exhibit 1, ¶ 11.) The comparison of night shift rosters against Kronos time clock records for mandatory posts revealed a total of approximately 4,778[4] undocumented hours from April through October 2012, with the highest concentration of undocumented hours in June and July 2012 and a tapering off in the later months reviewed. (Id., ¶ 12.) In general, this was consistent with witness testimony and other evidence indicating staffing pressures were greatest during the summer months and eased in the fall and winter as new employee classes became available. (Id.) The staff shortages during this seven-month period were attributed by witnesses to several things, including loss of available correctional officers due to peace officer standards and training issues, National Guard or other service duties, the addition of three new discretionary positions, call-offs, and hospital duty. (Id.) Staffing pressure was particularly strong during the ███████████████████████████████, when ██████ personnel ████████████████████████████[5] (Id.)

Upon receiving these findings, Myers and Warden Wengler enhanced the corrective action plan so as to target these specific areas of weaknesses. (Exhibit 2, ¶ 8.) Conry also authorized an increase in staffing positions by 10 correctional officers to give ICC some flexibility in staffing.[6] (Id.) On April 9, 2013, CCA made an in-person report to IDOC, the Attorney General's Office, and state police of the investigation status and result, and conveyed the corrective action plan. (Exhibit 1, ¶ 13; Exhibit 2, ¶ 8.) CCA offered to adjust its April 2013

---

[4] Plaintiffs mistakenly interpret this number as being 4,778 vacant *posts*. This number represents the number of undocumented *hours* during the night shifts for the period. (Exhibit 1, ¶ 12.)

[5] The three additional staff members required under the Settlement Agreement were primarily assigned to the day shift. (Exhibit 3, ¶ 6.)

[6] The IDOC Contract requires 342.9 staffing positions be filled. (Exhibit 2, ¶ 10.) That number includes the "plus three" positions required under the Settlement Agreement. (Id.) In 2011, CCA authorized and budgeted 380.75 positions, in 2012 it authorized and budgeted 397.25 positions, and in 2013 it authorized and budgeted 398.25 positions. (Id.)

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)** - **6**

Case 1:10-cv-01850-BLW Document 51 *SEALED* Filed 08/16/13 Page 7 of 10

invoice to IDOC as an indication of its good faith desire to address the roster discrepancies indicated by the April-October 2012 night shift review. (Exhibit 1, ¶ 14.) On April 23, 2013, former Assistant Chief Melody and Chief of Security Jepsen were terminated. (Exhibit 2, ¶ 9.) Since the investigation results, CCA has conducted training at ICC pertaining to reporting misconduct and ethical leadership training with management. (Exhibit 1, ¶ 15.) Throughout this process, CCA has remained in communication with and has also cooperated fully with IDOC's own investigation. (Exhibit 2, ¶ 8.)

Although CCA readily admits that there was a technical breach of the Settlement Agreement, the breach was not willful or intentional, and certainly not orchestrated by CCA. CCA terminated the employees it determined bore primary responsibility for the roster discrepancies and the failure to communicate the underlying issues giving rise to those discrepancies up the chain of command. CCA took it upon itself to investigate the allegations and devoted substantial resources to get answers. It reported the allegations and the results of its investigation to IDOC and the State of Idaho; it did not conceal either. CCA then took immediate corrective action to fully staff the mandatory posts and to ensure that the posts would not be vacant.

No additional action by this Court is necessary. Plaintiffs suggest to extend the life of the Settlement Agreement. But Plaintiffs provide no legal authority for such a remedy, and doing so would essentially be re-writing the terms of a private settlement agreement and forcing on Defendants a provision that they did not bargain for. (See Dkt. # 25, Exhibit A, ¶ 19.) Plaintiffs also suggest a fine, but that hardly seems appropriate where CCA did not know about, order, or condone the roster discrepancies. Two additional things counsel against any further action. First, there is a pending criminal and IDOC investigation. Thus, CCA faces potential criminal sanctions and breach of contract remedies. Second, none of the Plaintiffs allege that they were harmed as a result of the vacant posts. Indeed, the undocumented hours were between ▓▓▓▓ and ▓▓▓▓., when most inmates are locked in their cells for the evening. (Exhibit 3, ¶ 6.) It would be unjust to compensate them absent any injury.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)** - 7

## III. DISCOVERY IS NOT NECESSARY

Plaintiffs request to conduct discovery so that the Court is aware of the "degree" and "magnitude" of noncompliance. Plaintiffs believe that such knowledge will be helpful in fashioning a remedy. But again, the cases Plaintiffs cite to support this request involve determining a remedy for the violation of a court order in a civil contempt proceeding, which is not the case here. Regardless, the broad discovery Plaintiffs wish to take will be a waste of the parties' time. CCA has already admitted that mandatory posts were not staffed for 4,778 hours during a seventh-month period in 2012. That breach, however, was not known or intentional, and a corrective action plan has been put in place.

The only thing that Plaintiffs' proposed discovery may reveal is more undocumented hours *in the past*. Plaintiffs contend that they "believe that CCA is being dishonest in claiming that it fabricated only 4,800 hours of staffing records, and that the correct number is [20,000 hours]." CCA is not being dishonest; the 4,778 undocumented hours represent hours during the night shift between April and October 2012. (Exhibit 1, ¶¶ 9–12.) That number was based on a comparison of time records and roster sheets. (Id.) CCA has never represented that the reported number of undocumented hours was anything more than that.[7] Plaintiffs' 20,000-hour number is based on the conclusory avowals of one former and two current employees; their time frames are general and unlimited; they allege multiple forms of falsification; one affiant (Frey) works the day shift only; another affiant only worked the night shift one day a week; and all of the affiants contradict each other as to the number of vacant posts they have witnessed.[8] But whether this speculative, anecdotal evidence is credible or accurate is besides the points.[9] The point is this: uncovering additional undocumented hours in

---

[7] Plaintiffs' cover-up allegation is also belied by the fact that CCA self-investigated and self-reported the staffing allegation to IDOC, the Attorney General's Office, and state police upon learning of it.

[8] Plaintiffs' allegations of understaffing at *other* CCA facilities *three*, *four*, and *ten* years ago are irrelevant and not accurately reported.

[9] Notably, all three affiants avow that they informed IDOC contract monitors of their allegations; yet no action was taken. (Fry Aff., ¶¶ 23–25; Sonnier Aff., ¶ 10; Mullen Aff., ¶ 15.)

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40)** - **8**

the past is not helpful to enforce the Settlement Agreement prospectively. Plaintiffs' counsel simply wants to conduct a fishing expedition in hopes of collecting fodder for his anti-private prison crusade. (Exhibit 4.)

Instead of accelerated discovery followed by a hearing, Defendants propose scheduling an earlier hearing (either in California or Idaho), at which a CCA representative can explain to this Court (and Plaintiffs' counsel) their investigation, the results, the corrective action plan, and the current state of staffing. After getting an accurate picture of what has transpired, if this Court determines additional information is needed to enforce the Settlement Agreement, CCA would be happy to produce any witness whom the Court would like to hear from to determine whether an appropriate cure is in place.

## CONCLUSION

For these reasons, both of Plaintiffs' Motions should be denied.

DATED this 24th day of June 2013.

STRUCK WIENEKE & LOVE, P.L.C.

By     */s/ Daniel P. Struck*
        Daniel P. Struck
        E-mail: dstruck@swlfirm.com
        Timothy J. Bojanowski
        E-mail: tbojanowski@swlfirm.com
        Tara B. Zoellner
        E-mail: tzoellner@swlfirm.com

        Kirtlan G. Naylor
        E-mail: kirt@naylorhales.com
        NAYLOR & HALES, P.C.

        Attorneys for Defendants Timothy Wengler
        and Corrections Corporation of America, Inc.

2770924.1

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE AND PLAINTIFFS' MOTION FOR RELATED DISCOVERY (DKT NOS. 39, 40) - 9**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of June 2013, I filed the foregoing electronically through the CM/ECF system under seal, and further certify that on such date I served the foregoing SEALED document on the following by electronic mail:

> pevaraclu@aol.com
> reppink@acluidaho.org
> jameshuegli@yahoo.com
> kirt@nalorhales.com
> jrs@naylorhales.com


            */s/ Daniel P. Struck*