UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA KELLY, JOSE PIÑA, ANDREW IBARRA, RAY BARRIOS, RANDY ENZIMINGER, MICHAEL MIERA, PRISONER A, and PRISONER F, Individually and on behalf of a class of all other persons similarly situated, | Case No. 1:11-CV-185-S-EJL **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| TIMOTHY WENGLER, and CORRECTIONS CORPORATION OF AMERICA, INC., | |
| Defendants. | |

**INTRODUCTION**

Before the Court is the issue of whether Defendants Timothy Wengler and

Corrections Corporation of America ("Wengler," "CCA," and collectively "Defendants")

should be found in civil contempt for violating the Settlement Agreement (Dkt. 25, Ex.

A, hereafter "Settlement Agreement") by which the Parties agreed to settle this case. The

Settlement Agreement at Paragraph 15 separately allows for the Court to rule on whether

a party has committed a breach.

After considering all filings and the testimony from hearings on August 7 and 8,

2013, the Court hereby finds Defendants were in civil contempt of the Settlement

Agreement (and thus that they also breached the agreement). They did not take all reasonable steps to comply with the Settlement Agreement,[1] they regularly fell short of their obligation to staff positions that are mandatory under their contract with the Idaho Department of Correction (IDOC). Even in the weeks prior to the hearings, CCA was still not filling all mandatory posts.

This is not a case where staffing-related concerns appeared out of nowhere—in the year prior to the Settlement Agreement, these issues were raised in correspondence between IDOC and Defendants. Defendants had compelling reasons to regularly and thoroughly check that they were complying with the staffing requirements in the IDOC contract and Settlement Agreement. They had promised the state to improve record-keeping to make it easier to track staffing assignments. And yet it is clear that there was a persistent failure to fill required mandatory positions, along with a pattern of CCA staff falsifying rosters to make it appear that all posts were filled. Defendants did not keep clear records, did not specifically inquire about compliance with staffing levels, and thus they did not take all reasonable steps to comply with the Settlement Agreement.

As such, Defendants have deprived Plaintiffs of a key provision of the Settlement Agreement, one that Defendants promised to meet, and that was bargained for as a condition of resolving this case.

The Court will first briefly discuss the background to this Order, then outline further evidence it finds clearly and convincingly shows Defendants' failure to comply

---

[1] The Court has previously ruled (Dkt. 56) that the Settlement Agreement was incorporated into the order dismissing the case and thus became an order of the court, enforceable through contempt and breach proceedings.

with the Settlement Agreement. It will then address competing arguments about the appropriate relief. The Court declines at this time to impose some of the remedies Plaintiffs suggest, but reserves the ability to modify this order.

## BACKGROUND

On April 11, 2013, CCA issued a press release, Plaintiff's Exhibit ("Pls' Ex.") 106, announcing that it had "concluded an extensive internal investigation" and found that there "were some inaccuracies" in staffing records over a seven-month period. The company said it regretted "decisions made by certain ICC staff members" and said it would take remedial steps, including compensating Idaho for unverified hours.[2]

IDOC's press release, Pls' Ex. 105, provided additional details. It noted that there were nearly 4,800 hours over seven months where records indicated a correctional officer was staffing a security post but the post was actually vacant. IDOC announced that CCA acknowledged falsification of staffing records, and IDOC also said that Idaho State Police would examine the findings and evidence to review whether a criminal investigation was justified.[3]

CCA began investigating falsified shift records in December 2012, after an investigator on an unrelated case, a harassment allegation, received information about mandatory posts going unfilled. *See* Pls' Ex. 130. On January 23, 2013, the investigator

_____

[2] CCA does not directly bill IDOC per hour of officer work. Rather, the company is paid by a formula that calculates "inmate days"—the number of inmates and the number of days the inmates are housed. In correspondence, CCA has told IDOC that it would reduce one invoice by $117,024 as an indication of their desire to resolve the issue. Pls' Ex. 119. If the reduction is meant to fully compensate IDOC for about 4,800 in missing hours, that compensation rate works out to about $24.50 per missing hour.

[3] As far as the Court is aware, that state police review has not concluded. IDOC and CCA have also not reached a resolution about CCA compensating the state for the falsified hours.

reported preliminary findings to Scott Craddock, CCA's assistant general counsel. Craddock determined the allegation of falsified hours was credible. CCA informed IDOC of the investigation and allegation of falsified records of mandatory posts. It also told ICC Warden Tim Wengler about the case, and placed Assistant Chief of Security Daniel Melody and Chief of Security Brian Jepsen on leave. On February 5, 2013, CCA retained a law firm to take over the staff investigation. By mid-March, the lawyers confirmed falsified night shift records. On April 9, Craddock and various CCA officials briefed state police, the attorney general, and IDOC on their findings.

In June 2013, Plaintiffs filed motions seeking discovery, and asking for proceedings to consider a finding of contempt against Defendants. This case, *Kelly et al. v. CCA et al.*, 1:11-cv-0185-EJL, had alleged constitutional violations at ICC because of high levels of inmate-on-inmate violence, inadequate staffing and training, inadequate investigation of assaults, and various other defects. In short, Plaintiffs had accused Defendants of turning a blind eye to a level of violence at ICC that was several times higher than other prisons in the state.

During a settlement conference in September 2011 that lasted 46 hours over three days, the Parties reached an agreement to settle the case in its entirety. They filed with the district court their Settlement Agreement, which was incorporated to the order dismissing the case (Dkt. 26). The Settlement Agreement provided at Paragraph 15 that Judge Carter, who sits in Idaho by special designation, would have authority to resolve disputes about compliance with the Settlement Agreement in his capacity as a federal district court judge. In addition to agreements about issues that included training, investigations, and

disciplining inmates, CCA agreed "to comply with the staffing pattern pursuant to CCA's contract with the Idaho Department of Correction." Settlement Agreement ¶ 4. CCA also agreed to add three correctional officers to their staffing pattern to be used at the discretion of Defendant Wengler, the warden at ICC at the time.[4] The Settlement Agreement and all its agreements are set to expire on the two-year anniversary of its execution, meaning in September 2013.

Further facts shall be discussed below as part of the Court's findings and analysis.

## LEGAL STANDARD

Criminal contempt is shown where there is a clear and definite court order, the contemnor knows of the order, and he or she willfully disobeys it. *United States v. Rose*, 806 F.2d 931, 933 (9th Cir. 1986). A criminal contempt sanction both vindicates the Court's authority and punishes the contemnor. *United States v. Doe*, 125 F.3d 1249, 1256 (9th Cir. 1997).

A civil contempt proceeding differs in that failure to comply with a court's order does not need to be willful. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985). The purpose of civil contempt is to coerce compliance with a court order or to compensate another party for the harm caused by the contemnor. *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443 (1986). Whether contempt is civil or criminal thus turns on the "character and purpose" of the sanction. *Int'l Union, United Mine Workers of America v.*

---

[4] Wengler retired in May, at the age of 46.

*Bagwell,* 512 U.S. 821, 827 (1994) (citing *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441 (1911)).

"A court has wide latitude in determining whether there has been contemptuous defiance of its order." *Gifford v. Heckler,* 741 F.2d 263, 266 (9th Cir. 1984). To find a party in civil contempt, which is the only form of contempt at issue here, the contempt must be shown by clear and convincing evidence. *Battaglia v. United States*, 653 F.2d 419, 422 (9th Cir. 1981). "Failure to comply consists of not taking 'all the reasonable steps within [one's] power to insure compliance with the order.'" *Balla v. Idaho State Board of Corrections*, 869 F.2d 461, 466 (9th Cir. 1989) (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976)).

Courts also have "broad equitable power to order appropriate relief in civil contempt proceedings," *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (citing *McComb*, 336 U.S. at 193). When considering a sanction to make a defendant comply with a court order, the court should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947).

## DISCUSSION

There are three chief reasons that the Court finds Defendants in civil contempt of the Settlement Agreement. First, they had ample reason over the past two years to proactively check that they were in compliance with staffing requirements for mandatory

positions. Many of the problems found in the CCA and IDOC investigations were previously raised in the months prior to the Settlement Agreement.

Second, it is clear that the non-compliance was far worse than the report of about 4,800 hours would lead one to believe. That figure came from attorneys CCA hired to investigate, and who primarily examined staff rosters and timecard records for the night shift from April 2012 through October 2012. Testimony showed that there were significant day shift vacancies, which would not be included in the 4,800 figure. There is also no reason to believe the problem only began in April 2012 and was solved after October 2012. Indeed, even in the weeks prior to the contempt hearings, mandatory posts[5] were still going unfilled—thus there remains persistent staffing pressure that is the backdrop to prison employees fabricating records. The difference today is that CCA may finally be presenting an accurate picture of its inability to fully staff its prison.

The third reason for the Court's finding of contempt is that Defendants' arguments in opposition are not convincing. Having clearly violated the staffing requirements, they contend that their remedial steps should suffice to resolve the problem, and that these steps show they took all reasonable steps to comply with the Settlement Agreement. After considering and rejecting this argument, as well as several others that Defendants make, the Court will turn to remedial measures, including an extension of the Settlement Agreement.

---

[5] Typically there were 55 posts on the day shift classified as mandatory, and 37 on the night shift.

**1.      Defendants knew, or should have known, of challenges in filling staff posts**

On November 3, 2010, Shane Jepsen, the chief of security at ICC,[6] sent a

memorandum to Warden Wengler regarding staffing, and copied two assistant wardens

(Kessler and Perez). Jepsen noted several issues:

> -Using supervisors and staff with case management duties[7] to fill
> correctional officer positions when such a practice should not happen, in
> part because those staff members already have other duties

> -Staff listed as working two to three posts during a shift without explanation
> as to how this could be possible[8]

> -"Standing down" officer posts late in the evening, and other shortages of
> staff

*See* Pls' Ex. 109. Jepsen recommended hiring to fill vacancies and amending the contract

to allow for CCA to drop to lighter staffing in certain hours when needed. He wrote that

he did not have the answer to avoiding putting supervisors and case managers in

correctional officer positions, "as this has always been a common practice." *Id*. He noted

that if all vacancies were filled, it would likely help.

IDOC also raised staffing concerns at the end of 2010. In a memo dated December

20, 2010, Natalie Warner, an IDOC official, detailed concerns that included:

> - Shift supervisors "posted to provide ancillary tasks"

---

[6] Jepsen was fired in April. CCA determined that complying with the staffing pattern was his responsibility, and that "evidence exists which suggest that you may have had some knowledge of vacancies or inaccuracies in staffing records but failed to investigate and take corrective action." Pls' Ex. 108. The assistant chief of security, Daniel Melody, also was fired.
[7] For example, a case manager would more typically have a social work background and education, rather than a corrections officer's training and background.
[8] A shift supervisor typically typed up rosters at the end of the day to reflect shift assignments, and changes the supervisor had made when deciding where to assign staff to cover required positions. The supervisor would usually be a captain, or sometimes a lieutenant. The supervisor would sign the final roster, which would then usually go to the assistant chief of security, Daniel Melody, or to Jepsen. Warden Wengler testified that he regularly examined rosters.

- Employees assigned to multiple posts on the same day
- Case managers were assigned correctional officer posts, which is "an unacceptable practice"

Pls' Ex. 113. With respect to assigning employees to multiple posts on a shift, CCA's response was, according to the memo, a promise to modify shift rosters to have the level of detail needed to determine "varying coverage of multiple posts during a 12 hour shift."

Defendant Wengler replied to Warner's memo in January 2011. Pls' Ex. 114. Wengler wrote that "CCA is committed to ensuring that all mandatory posts are filled at all times," and he reiterated the commitment to shift rosters with the detail needed for IDOC to monitor the practice of having multiple employees cover the same post. Pls' Ex. 114.

Warner wrote a CCA Vice President in June 2011 to inform CCA that it would not be pursuing damages under the contract, or further remedial action. Pls' Ex. 115. The letter warned, however, that there were five recent cases where a required housing unit post was not filled during the first shift, either in part or for the entire shift. *Id.*

At the contempt hearing, Plaintiffs' counsel asked Warden Wengler whether it was a fair statement to say that he must have known, by the time of the Settlement Agreement in September 2011, that he needed "to stay on top of things and make a special effort to ensure compliance with the requirement of full staffing."

"As this says [referring to the June 2011 letter], yes," Wengler said. "We knew there was a challenge and we were meeting their expectations to fix it."

Timothy Higgins, IDOC's deputy warden for the contract prison oversight unit,

testified at the contempt hearing that CCA's shift rosters would, up until recently, merely reflect if coverage was split among more than one employee (for example "Floor Post #1: Smith/Johnson,") but they would not specify what hours were worked. This made it difficult to spot actual double posting (i.e., where an employee could not possibly be in two posts at the same time), because it was possible that officers were merely being rotated from post to post. This level of detail is now available in CCA's rosters, but only after the falsified records came to light. Such a step is clearly part of a reasonable attempt to comply with the Settlement Agreement, and the correspondence from before the Settlement Agreement shows that Defendants knew they had to make this type of improvement.

In his hearing testimony, Warden Wengler said that using supervisors and case managers as floor officers in the past two years would only be done if absolutely necessary, and stated that this had to be done two to three times per week. What IDOC flagged before the Settlement Agreement as an "unacceptable practice," was a regular occurrence, one that continued during the Settlement Agreement. Jepsen testified that if the prison had, for example, 15 officer job vacancies from the number of jobs CCA had budgeted for, there could be a non-correctional officer covering a correctional officer's shift four times a week.

Thus, Defendants had ample reason to examine whether they were meeting staffing requirements under the *Kelly* Settlement Agreement. They had already been put on notice of several signs of staffing shortages. They had already been informed that their records raised concerns both about listing an employee on more than one post and about

not having enough detail about multiple postings, such as specific hours worked. They promised then, as they promised in the Settlement Agreement, and as they promise going forward, that they would fill the mandatory positions under their contract.

**2.    There are far more unfilled hours for mandatory posts than the 4,800 figure**

It is clear that there were a significant number of vacant mandatory posts beyond the seven-month period that CCA examined in detail during its investigation. From its press release on the findings, CCA stated that its internal investigation was "extensive," and that the unverified hours are but a fraction of total staffing requirements. Pls' Ex. 106. Nowhere did CCA mention that they were publicizing only the tally from a detailed examination of night shift records, and not numbers from any review of the day shift.

At the time, CCA knew there were also day shift posts that were not filled. The attorneys it retained had looked at day shift records for May 2012. They examined them in less detail than their review of the night shift and excluded a subset of mandatory posts less connected to security positions.[9] They found 152.8 undocumented hours. Pls' Ex. 118 at 8. A check of June 2012 day shift records, again in less detail than the night shift review, found about 300 undocumented hours, according to testimony from Scott Craddock, assistant general counsel for CCA.[10]

---

[9] There are mandatory 8-hour posts, such as unit managers and addiction treatment counselors, and mandatory 12-hour posts, such as the typical floor corrections officer. CCA's review looked at the 12-hour posts and not the 8-hour posts. As the attorneys noted, the day shift calculations are far more complicated than the night shift because there are more mandatory positions, and those positions include posts that are less directly related to security.

[10] Craddock testified that the examination of night shift records also assumed that if someone was listed at both a non-mandatory post and a mandatory post, the mandatory post would be the one actually staffed. This wouldn't necessarily be true. As Kevin Myers, a managing director for

Testimony from two former ICC employees, Jaune Sonnier and Annette Mullen, also supports a finding that there were unmanned mandatory posts, and that these shortages were obvious to spot if Defendants had taken reasonable steps to investigate.

Mullen worked as a corrections officer from September 2008 to May 2010, and then as a corrections counselor (a supervisor) from May 2010 until she left ICC in January 2013.[11] She worked in the West Wing, A Pod Segregation, the DEF unit, and the PIE unit. Mullen testified credibly that she saw regular, glaring absences in 2012,[12] and complained frequently to her superiors to try to fix the problem. She testified that she went up the chain, including to assistant warden Thomas Kessler. She was usually told either to make do with the officers she had or, in the case of Kessler and another official, the chief of unit management, was told to complain to her direct supervisor.[13] Staffing shortages were, as Mullen testified, common knowledge at the prison.

In the PIE unit, one mandatory post was unfilled "more often than not," Mullen testified, and about once a week two officers were missing. Mullen also testified that she had seen her name on rosters as double-posted. Sonnier, a former addictions treatment counselor who worked in the PIE unit, testified that she regularly had to wait, sometimes

---

CCA testified, sometimes staff would post someone to a non-mandatory shift instead of the mandatory shift, depending on the circumstances.

[11] Mullen testified that she told CCA's human resources department that she liked her job, and she testified that she left because of childcare duties and because the job did not make sense for her financially.

[12] This does not include June through October of 2012, when Mullen was out on maternity leave.

[13] Mullen testified that she reported her concerns through an employee reporting system online either in November 2012 or December 2012. Counsel for CCA stated at the hearing that CCA would look into whether such a report existed. CCA officials had testified that no reports about unfilled mandatory posts were received through the employee reporting systems in place. The Court is not aware of the result of the inquiry CCA said it would make.

as long as 20 minutes, to reach an officer in the unit so that she could be let out at the end

of her shift. At least one missing corrections officer, for a mandatory post, happened

often, she said. Generally, a housing area in ICC has a handful of officers assigned to

posts.[14] So, for example, a unit might have three correctional officers assigned to walk

the floor. A missing officer is more noticeable in this context than if one were trying to

spot the missing officer in a prison layout with 20 mandatory floor officer posts in a

single building.

IDOC follow-up examinations of staffing also show more extensive and ongoing

violations of the Settlement Agreement. Deputy Warden Higgins testified that now that

CCA provides documents clearly showing mandatory posts and the times they were

filled, as well as a separate report whenever a post was left empty, his staff is able to keep

better tabs on staffing issues. Higgins' staff has examined about 20 days of data, chosen

from April 2013 onward. They found that mandatory post vacancies on a given day have

ranged from 18 hours to about 40. Assuming the 20 days are not outliers, and taking the

low end of vacant hours—18 per day—this would suggest 540 hours of vacant mandatory

posts might be found in one month (30 days x 18 hours = 540).

There has yet to be a detailed examination of vacancies for the duration of the

Settlement Agreement, nor has there been a detailed examination of day shift vacancies.[15]

But from what was presented at the contempt hearings, it is clear that nearly two years

after the Settlement Agreement was entered into, there are still significant staff shortages

---

[14] The Court is vague in describing assignments because it agrees with Defendants that
publicizing specific staffing assignment numbers could cause security problems for the facility.
[15] An accounting firm is currently working on such a report, according to Higgins.

that lead to mandatory posts going unfilled. For example, on July 23, 2013, the shift supervisor closed three mandatory officer posts for certain hours because of staff shortages.

Unfortunately, the problem of short-staffing seems likely to take considerable time to resolve. Plaintiffs have introduced evidence showing that this has been a problem from the beginning of the settlement period, *see* Pls' Ex. 116, through to the present. In an informal spreadsheet to monitor "key performance indicators," prison officials throughout 2012 recorded consistently being short of a CCA-authorized hiring number of 213 security officers. *See* Pls' Ex. 111. The shortage ranged from 18 to 6 over 2012; there was never a surplus. *Id.* CCA reports difficulties recruiting and retaining enough officers, but its current warden, Jason Ellis, and his managing director, Kevin Myers, both testified that they would be attempting to hire 10 officers above their usual budget for correctional officers.[16] This means there is a double hurdle—CCA must first clear the officer total that it has budgeted for, then it must go above this number in the hope that this will be enough officers.[17]

Put simply, Plaintiffs deserve the relief they bargained for in the Settlement Agreement and, with respect to staffing, they are still waiting for the promised compliance. Even the specific three officers that were added as a result of the *Kelly*

---

[16] These extra officers were authorized by CCA management in April. Training classes take 7 to 8 weeks, and CCA plans two training classes to begin in September. The decision to start those classes, according to managing director Myers, was made a week before the contempt hearing.
[17] Defendants' Exhibit 4, a snapshot of the staffing at ICC as of July 19, 2013, indicates that the prison has almost cleared the first hurdle. This is as of three months after the press releases, and six months after CCA first determined there was a credible allegation of covering up vacant posts.

Settlement Agreement, to be used at the warden's discretion, had some vacancies on at least thirteen days in 2012. *See* Pls' Ex. 134.[18]

\*     \*     \*

CCA's own investigation noted that "[f]acility senior management, including the Warden and Assistant Wardens, were aware of acute personnel shortages in the spring, summer, and fall of 2012." Pls' Ex. 118 at 4.[19] Yet Warden Wengler testified he did not check at any point in 2012 for vacancies "specifically," nor did he ever walk around the prison and compare the staff roster to the officers on required posts. When asked if he felt he met the expectations of his job when it came to filling the mandatory posts, Wengler testified that, "to the extent of going back and checking more often on the people that were responsible for it, no."[20] CCA managing director Kevin Myers testified that he now visits ICC monthly, and specifically asks his employees to show him how they can prove that they are filling all required positions. That is a promising development; it is also the sort of diligence that should have been present for the past two years. The Court finds that this responsibility to check on mandatory staffing posts falls higher than Wengler's subordinates: it falls on him, and it falls on CCA.[21]

---

[18] This includes one day where no officers were assigned to these posts. These assignments were noted as "Warden's Utility" on the rosters. They worked a weekday day shift and were usually assigned to the most troubled unit, DEF.

[19] The report went on to note that all senior management denied knowing mandatory posts were vacant, "or that rosters were being completed in a fashion that could make it difficult to detect vacancies."

[20] Wengler testified that he did regularly look at shift rosters, but did not see vacant mandatory posts, or an officer working multiple posts. As noted in Section 1, this is a blindspot of his (and CCA's) own making because of the poor quality of CCA record keeping.

[21] In other portions of their testimony, both Wengler and his supervisor, Myers, did admit that they bore a portion of the responsibility for staffing shortages.

### 3. Defendants' counterarguments

#### A. Defendants' reliance on *Vertex* is not persuasive

Defendants contend that they cannot be held in contempt for the same reason that the defendant in *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885 (9th Cir. 1982), was not in contempt. They read *Vertex* for the idea that a court should not hold a defendant in contempt if, after discovering it violated a court order, CCA "took steps to correct" the violation "before plaintiffs moved for an order of contempt." Defendants' Hearing Brief (Dkt. 62, "Ds' Hearing Br.") at 4.

In *Vertex*, the Ninth Circuit decided that a district court was within its discretion to deny the plaintiff's applications for civil contempt. Plaintiffs had sued for trademark infringement, and the parties reached a consent judgment by which, as is relevant here, the defendants were expressly prohibited from using "Falcon Foam Plastics, Inc." as their name for commercial or publicity purposes. *Id.* at 887. Defendants then used that name for two listings in one edition of a phone directory. *Id.* at 892. They put evidence before the trial court that the violation had been found and steps taken to correct it before plaintiffs moved for contempt. *Id.* The appellate court determined it was not abuse of discretion, under those facts, to find that "defendants made every reasonable effort to comply with the court's order." *Id.*

Here, Defendants' actions are simply not on the scale of the minimal harm caused by two erroneous phonebook listings. Defendants knew prior to the Settlement Agreement that they had problems staffing all posts, and hiring enough correctional officers. They knew this during the Settlement Agreement's enforcement period as well;

their internal spreadsheets showed them consistently below their staffing budget numbers. They had both notice and a long time to realize that they needed to check on their ability to staff mandatory positions.

It is a positive step that CCA investigated in December, found the allegations credible in January, and worked out a plan of action in March and April (including planning to hire more staff, training existing staff to prevent falsifying records, and finally improving their record keeping).[22] But this is not a particularly speedy response, not when the Settlement Agreement is winding down and any new recruits must go through about two months of training.[23] And while the newfound transparency in record keeping is also for the better, this is a long overdue move. It was part of the reasonable steps CCA should have taken years ago, and it is not a reason to find that CCA should not be held in contempt.

**B.** *A finding of breach, and contempt, does not depend on an increase in violence resulting from the breach*

Defendants have repeatedly argued that there should be no breach given that the touchstone of Plaintiffs' lawsuit was the levels of inmate violence at ICC. *See, e.g.*, Ds' Reply at 5. They contend that unless Plaintiffs can show short staffing led to more violence, they cannot justify the contempt sanctions they seek. *Id.* This overly simplifies

---

[22] Defendants appear to be stretching the facts when they contend that they learned "of a vague allegation of roster discrepancies in January 2013." *See* Defendants' Reply Brief (Dkt. 66, "Ds' Reply") at 3. Scott Craddock, CCA's lawyer, testified that he learned of the allegation in December 2012. *See also* Craddock Decl., Pls' Ex. 130 at ¶ 3. It was in January that he determined the allegation was credible.

[23] The time it takes to get an officer hired is actually longer, given that it takes some time to recruit enough applicants that can pass initial screenings.

the relief Plaintiffs sought, and it ignores that the Settlement Agreement makes clear what is a significant breach. Defendant CCA agreed to "comply with the staffing pattern" in its contract with IDOC and to add three correctional officers. That is not a qualified commitment; it does not provide the sort of leeway that CCA now seeks.

Plaintiffs were, of course, deeply concerned with levels of violence at ICC, and they contest the claim violence has decreased. But that is not the only concern they had. Having enough correctional officers can deter violence, but also it also offers other benefits, such as having enough staff on the prison floor to accurately track the levels of violence in the first place. A court should be wary of ignoring the terms of an agreement in favor of writing a "no harm, no foul" principle into the agreement.[24]

Similarly, the argument that perfect staffing "simply is not realistic," Ds' Reply at 3, distracts from the point of civil contempt proceedings, which focus on whether a party took all the reasonable steps it could to comply. *Balla*, 869 F.2d at 466. The outcome here (that Plaintiffs did not get the relief promised in the Settlement Agreement) matters, but most important for contempt is the fact that Defendants should have done more to inquire about staffing compliance.

---

[24] As the *Vertex* court noted, "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." 689 F.3d at 893 (citation omitted).

### C. *Casting this as a modification of the Settlement Agreement does not change the outcome*

After Defendants filed the hearing brief that the Court agreed to allow, they then filed a Reply and raised a new argument that extending the Settlement Agreement is a modification of a decree. Ds' Reply at 6 (citing *Labor/Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009)).

"A party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992).  Failing to substantially comply with the terms of a consent decree can qualify as the significant change in circumstances that justifies extending the decree. *Labor/Cmty Strategy Ctr.*, 564 F.3d at 1120-21. Given the serious doubt that there was ever compliance with Paragraph 4 of the Settlement Agreement, narrowly tailored relief should include extending the duration of the agreement. The Court thus agrees with Plaintiffs that the outcome here would be the same as it is under the contempt standard.

### 4. Remedies

When considering a sanction to make a defendant comply with a court order, the court should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United Mine Workers*, 330 U.S. at 304.[25]

---

[25] Defendants argue that a Court *must* find willfulness to impose a coercive sanction. Ds' Reply at 4. As their own explanatory parenthetical makes clear, willfulness is a factor a court should

The Court shall consider Plaintiffs' proposed remedies in turn.

**A.    Two year extension of the consent decree**

The Court agrees with Plaintiffs that they have not received a key provision of the Settlement Agreement, and that this failure has lasted nearly as long as the duration of the Settlement Agreement. For CCA staff to lie on so basic a point—whether an officer is actually at a post—leaves the Court with serious concerns about compliance in other respects, such as whether every violent incident is reported. CCA represents that it is waiting for a state investigation to finish before it takes any further discipline (beyond the two staff fired). That is a decision the Court does not second-guess. But this also means that the same supervisors who signed falsified record sheets remain on the job, which leaves the Court concerned about compliance with the Settlement Agreement. Plaintiffs and the Court must be able to know with confidence that every required post is filled, without exception or excuse.

The Court rejects Defendants' contention that the most significant problems occurred within seven months, and thus only a seven-month extension would be appropriate. Seven months is one set of evidence, but only because Defendants limited their investigation, and state investigations and an audit are not yet complete. The evidence outlined above makes clear that this Court concludes the vacancies extended well beyond the seven month period, and that one reason the truth is hard to find is that Defendants kept records that obscured who was working at what posts and at what times.

---

consider, but not a finding that must be made. *See id.* (citing *Sublime v. Sublime Remembered*, 2013 WL 3863960 at *6 (C.D. Cal. July 22, 2013) ("When imposing a coercive civil contempt sanction, a court should consider . . . the willfulness of the violating party.").

From the employees falsifying records there was clear willfulness but, as the Court noted above, there is an element of willfulness from higher ups in (1) not verifying compliance with the Settlement Agreement when they had ample reason to do so, based on knowledge of staffing pressures and past problems listing multiple employees at the same post; and (2) not fixing record-keeping problems when they promised to, and when the harm (multiple posting) had already been raised. For the above reasons, the Court finds that this extension narrowly draws the proposed relief to correct the violation.

      **B.**      **Independent monitor and report to the Court**

As part of its proposed solution to Plaintiffs' motion for contempt and breach, prior to the hearings, Defendants offered to hire an independent monitor on the issue of staffing. They contend now that such a monitor is unnecessary, and that IDOC keeps close tabs on them with the help of now-sufficient staffing records.

The Court agrees with Plaintiffs that an independent monitor is an appropriate resolution here. Checking compliance necessarily involves examining a set of staffing rosters, going over time-entry records, and other random audit methods (such as in-person checks). Relying on IDOC, a non-party to this case, imposes an added duty on the state agency to promptly report vacancies to this Court. This duty is most fairly handled by a monitor with a direct obligation to this Court and to the terms of the Settlement Agreement.

The Court directs both sides to confer about an appropriate monitor. If the Parties cannot agree on a monitor within five days of this Order, they must submit their choice to the Court for decision. The Court shall then choose the monitor.

**C.  Predetermined fines for vacant mandatory posts in the future and a threshold at which they would be triggered**

Plaintiffs ask the Court to set a predetermined hourly fine of $500 for any vacant mandatory posts above a threshold of 10 missing hours. By this proposal, the 11th missing hour in a given month would trigger a $500 fine. CCA's position is that $500 is an arbitrary, punitive figure, and that 10 missing hours is less than one full shift. This means one employee missing a shift on a mandatory post (with no one able to come in to cover, or to switch from a non-mandatory post) would lead to a fine. Instead, CCA proposes that if there are more than 100 hours of vacancies in a month, "an inquiry should be made as to the reason for the vacancy," Ds' Reply at 8, and then the Court should decide how to proceed.

The Court rules as follows: Any vacant mandatory post hours over 12 hours (the duration of one shift) in one month will lead to a fine of $100 per hour over that 12th hour. The Court's decision is based on a principle of escalating sanctions if a lower amount does not work.[26] If CCA continues to fall short of the staffing requirements, it should expect to see escalating fines in the future. Plaintiffs' $500 per hour proposal—or higher—may well become necessary to compel CCA to comply.[27]

---

[26] CCA contends that there may be absurd results if, for example, the laundry room is closed and thus the mandatory laundry officer post is vacant. CCA can petition the Court for relief in that narrowest circumstance.

[27] CCA insists that Plaintiff's proposed $500 fine is obviously punitive. Ds' Reply at 8 n.5. As an example, they note that this number, if applied to the 4,800 falsified hours, would be $2.4 million. Defendants miss the point: the amount of fine, if it succeeds in making them comply, should *prevent* the fine from reaching millions because Defendants will fix their behavior and begin living up to their promise in the Settlement Agreement. If a *prospective* fine leads to $2.4 million in penalties, CCA has no one to blame but itself.

### D. Ordering CCA to discipline more employees

The Court does not find it appropriate to order CCA to discipline more staff in response to the falsified records. As discussed above, the fact that supervisors who signed falsified rosters remain at ICC is a concern for compliance going forward. But the Court will not intrude on CCA staffing decisions when a state criminal investigation is ongoing.

### E. Determining additional vacancies

The Court also declines to order CCA to conduct an audit to find all missing staffing hours. IDOC, through Tim Higgins, has represented to the Court that such an audit is underway. Further, IDOC has its contractual remedies against CCA; it is up to that agency to determine what compensation it pursues for having been lied to.

### F. Attorneys' fees

The Settlement Agreement provides that this Court may award attorneys' fees and costs if it finds a material breach of the Agreement. These fees and costs are limited to those incurred in connection with the contempt motion and resulting discovery and hearings. Plaintiffs are directed to submit documentation of those fees and costs.

### ORDER

NOW THEREFORE IT IS HEREBY ORDERED:

1) Defendants are held to be in contempt and breach of the Settlement Agreement, as incorporated into the Order for Dismissal.

2) The Court GRANTS a two-year extension to the Settlement Agreement. The Court sets midnight on September 20, 2015, as the new date for the Settlement Agreement to expire.

3) The Court GRANTS a request to set a predetermined hourly fine, and sets that fine at $100 per hour for any vacant mandatory post hours over 12 hours in one month. The Court reserves the ability to modify this amount prospectively, and puts Defendant CCA on notice that it will consider escalating the fine amount as needed to achieve compliance.

4) The Court DENIES at this time both requests to determine additional vacancies, or to discipline staff, deferring at this time to the ongoing state investigations that may result in criminal prosecutions.

5) The Court ORDERS Plaintiffs to submit documentation of their attorney hours and requested fees and costs associated with pursuing contempt/breach of the Settlement Agreement.

DATED THIS 16th day of September, 2013.

DAVID O. CARTER, United States District Judge
For the Central District of California
Sitting by Special Designation